2020 IL App (2d) 180217
No. 2-18-0217
Opinion filed September 18, 2020

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Winnebago County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 17-CF-1209 |
| MARK A. GAINES, | ) ) | Honorable Brendan A. Maher, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE JORGENSEN delivered the judgment of the court, with opinion.
Justices McLaren and Bridges concurred in the judgment and opinion.

**OPINION**

¶ 1    A jury convicted defendant, Mark A. Gaines, of aggravated kidnapping, pursuant to sections 10-1(a)(1) and 10-2(a)(2) of the Criminal Code of 2012 (Code) (720 ILCS 5/10-1(a)(1), 10-2(a)(2) (West 2016)).  The trial court sentenced defendant to seven years' imprisonment.  On appeal, defendant argues that the State did not prove that he "confined" the victim, 10-year-old J.F., within the meaning of the kidnapping statute.  We affirm.

¶ 2                                I. BACKGROUND

¶ 3    This May 2017 kidnapping arose from an unusual set of circumstances.  We provide the following overview.  Defendant, age 47 when the offense occurred, and J.F.'s father, Alex F., age 33, had lived sporadically as roommates between 2005 and 2009.  During that period, J.F., born in

2006, was in the custody of the Department of Children and Family Services. When J.F. was four years old, Alex obtained sole custody of her. Defendant no longer lived with Alex, but he remained in Alex's life, with J.F. referring to him as "Uncle Mark."

¶ 4    The night before the offense, Alex invited defendant to his Rockford apartment. The two began drinking. After midnight, they left the apartment to buy more alcohol. (J.F. remained home alone, asleep in her bedroom.) While outside, the two men met a woman and they invited her to join them at Alex's apartment. The three adults drank and played video games.

¶ 5    Before 6 a.m., J.F., who has been diagnosed as being on the autism spectrum, awoke and got herself ready for school. She left the apartment at 6:05 a.m., saying goodbye to the three adults. A few minutes later, defendant left the apartment. Defendant approached J.F., who was waiting at the bus stop. Defendant told J.F. that she missed her bus. (The evidence was in conflict as to whether J.F. in fact missed her bus.) Defendant suggested that they spend the day together and that he would return her to her apartment at the end of the school day.

¶ 6    Defendant and J.F. left the bus stop to play at a park, go to a gas station and buy candy, and then go to the apartment of defendant's girlfriend, Sharon Choppi. The apartment building, known as the Faust, required a key fob, key card, or buzz entry; it was not open to the public. Inside the apartment, J.F. sat on the living-room couch, watched cartoons, and ate snacks provided by defendant's girlfriend. Defendant went to sleep on the living-room floor, physically separated from J.F. by a coffee table.

¶ 7    Meanwhile, Alex received a call from J.F.'s school, informing him that J.F. was not in attendance. Alex then called the bus driver, Danielle Williams, whom he knew socially. Williams told Alex that J.F. never got on the bus that day. Alex, becoming panicked, called defendant just before noon to ask if he had seen J.F. Defendant told Alex that he had *not* seen J.F., even though

he had just spent the last six hours with her and even though she was sitting in the next room of Choppi's apartment. Alex then called the police.

¶ 8     Within minutes of speaking to Alex, defendant decided to walk J.F. home. A police officer, Officer Michael Lange, noticed the pair a block or two from their destination. Defendant told Lange that he had *just then* found J.F. and was going to walk her home. Lange allowed this. Defendant did not take the most direct route, and some of the officers who had been waiting at Alex's apartment went to look for defendant and J.F. However, the remaining officers soon saw defendant and J.F. approach. According to those officers, defendant appeared surprised by the police presence, and J.F. appeared disheveled. Defendant was later arrested and charged with aggravated kidnapping under sections 10-1(a)(1) (secret confinement) and 10-2(a)(2) (victim under age 13) of the Code.

¶ 9                                                    A. Trial

¶ 10     At trial, the witnesses testified to the facts as set forth above, with the following details and discrepancies.

¶ 11                                              1. The State's Case

¶ 12                                                  a. Alex F.

¶ 13     Alex testified that J.F. left the apartment around 6:05 a.m. The bus stop was at the end of the street, and Alex could see the stop from the window. Alex did not look out the window that day, however. Defendant left the apartment five minutes after J.F. Their female acquaintance left the apartment three minutes after that. After everyone left, Alex ate breakfast and went back to bed. He was awakened by an automated phone call from the Rockford public schools, telling him that J.F. was not in attendance. Immediately, Alex phoned Williams and Williams told Alex that J.F. had not gotten on the bus that day. Alex, now panicked, called defendant, because he knew

that defendant had left the apartment around the same time as J.F. Defendant told Alex that he had *not* seen J.F. Thus, Alex called the police.

¶ 14    Eventually, defendant returned with J.F. Alex had not given defendant permission to take J.F. that day. However, Alex had allowed defendant to babysit J.F. in the past. J.F. called defendant "Uncle Mark," as did some adults in Alex's group of friends. Alex originally met defendant through defendant's niece.

¶ 15                              b. Danielle Williams

¶ 16    Williams testified that J.F.'s stop was the first stop on her bus route. J.F. was the only child at that stop. J.F. was almost always on time. In fact, J.F. would comment when Williams was late by as little as 30 seconds. Two weeks before the day in question, the bus pick-up time had changed from 6:17 a.m. to 6:10 a.m. That day, Williams arrived on time, at 6:10 a.m. J.F. was not there. Williams waited another seven minutes, until the old pick-up time of 6:17 a.m., before driving on to the next stop. Williams knows Alex socially, she knows J.F., and she remembers the day in question, because Alex called her just hours after she completed the route.

¶ 17                              c. J.F.

¶ 18    J.F. testified that, during that school year, she would wake at 5:30 a.m. She would leave her apartment by 6:05 a.m., and the bus would arrive soon thereafter. Once she left the apartment, she did not carry a watch or a phone. On the day in question, defendant approached her at the bus stop. She had known defendant for years, and she called him "Uncle Mark." Defendant stood with her at the bus stop for "a little bit." Then, he checked his cell phone and told her that the "bus is late or it arrived early." Defendant told J.F. that it was 6:25 a.m. He said, "Come with me and we'll pretend you've been at school and then I'll bring you back home when it's time for you to get off the bus."

¶ 19    Defendant and J.F. first went to a park near the bus stop. Defendant pushed J.F. on a tire swing. Defendant then walked with J.F. to a gas station, allowing her to purchase candy. J.F. identified herself in security footage from the gas station. She had been wearing a leather jacket and a pink backpack.

¶ 20    Defendant and J.F. next walked to Choppi's apartment. According to J.F., the apartment was located on the other side of town, and it took "a few hours" to walk there. J.F. thought it was defendant's apartment. She identified herself in security footage from the apartment building, entering the building at 8:17 a.m. Defendant introduced J.F. to Choppi. He also introduced her to Choppi's roommate, Joanne Hein, but he told J.F. that Hein was his mother. Choppi provided J.F. with snacks and sat next to J.F. on the couch. Choppi looked at an iPad, while J.F. watched cartoons. (Hein's friend, who also lived in the apartment building, stopped by, and he gave J.F. two Christmas decorations, including a ceramic Santa Claus. He did not talk to J.F.; rather, one of the women passed on the trinkets.) Defendant slept on the floor, separated from J.F. by a coffee table. Defendant woke to speak with Alex. After the phone call, defendant told J.F. that they were going home.

¶ 21    Defendant and J.F. walked home more quickly than they had walked to Choppi's apartment. Defendant never told J.F. that she had to hurry, but she felt that she had to hurry. Defendant told J.F. to keep quiet and that he would explain things to her father. When they returned home, J.F. saw police officers. The police officers interviewed J.F., and she told them what had happened that day.

¶ 22                                    d. Cliff Bennett

¶ 23    Cliff Bennett testified that he was a maintenance worker at the Faust apartments. Bennett knew that defendant did not live at the Faust but that defendant sometimes stayed with Choppi.

On the day in question, Bennett saw defendant walk toward the Faust with a little girl. Defendant approached Bennett, and defendant told Bennett that the girl was his goddaughter. The interaction concluded, and Bennett did not watch the two enter the building.

¶ 24                                    e. Sharon Choppi

¶ 25    Choppi testified that defendant sometimes stayed at her apartment. On the day in question, defendant arrived at the apartment around 8 a.m. with a little girl, and Choppi recognized the girl as J.F. She had seen J.F. once before, and she knew that Alex had a daughter. She did not talk with defendant as to why he had J.F. with him. She was still angry with defendant from the night before, when he left the apartment at around 11 p.m. Choppi did not remember sitting by J.F. on the couch. Instead, she remembered spending time in her bedroom, away from defendant, who slept on the living-room floor. She did remember providing J.F. snacks and giving her some Christmas ornaments. Near mid-morning,[1] Choppi noticed that Alex had attempted to call defendant through Facebook Messenger. (Choppi had access to defendant's Facebook account.) Choppi woke defendant, and defendant went into the bathroom to return Alex's call. Choppi did not hear the conversation. When defendant came out of the bathroom, he left with J.F.

¶ 26                                    f. Officer Michael Lange

¶ 27    Lange testified that he participated in the search for J.F. He found J.F. walking with defendant about two blocks from Alex and J.F.'s apartment. Defendant told Lange that he had just then found J.F. Lange allowed defendant to continue walking J.F. home. However, defendant did not take the most direct route to the apartment. Instead, he went past the apartment and then came back to it from the west. Because defendant and J.F. were slow to return, Lange went back out to

_____

[1] The State's exhibit shows that the calls took place just before noon.

look for them. Officers who had stayed at the apartment called Lange when they saw defendant and J.F. returning.

¶ 28 On cross-examination, Lange conceded that it took defendant no more than 10 minutes to walk J.F. home from the spot where he first saw them. On redirect, Lange clarified that, nevertheless, defendant took longer than expected, which is why Lange went back out to search for him. (Lange did not offer the pair a ride in his squad car when he first saw them, because he had a K-9 in the back seat.)

¶ 29 g. Officers Robert Hatfield and Josh Grover

¶ 30 Officers Robert Hatfield and Josh Grover testified to J.F.'s condition upon returning. Both stated that J.F. appeared messy and disheveled. Her clothing was dirty. When the officers questioned her, she began to breathe heavily and cry. They told her that she was not in trouble. They told her that they just wanted to find out if she had been hurt. She replied, "Uncle Mark would never hurt me." She did not have any visible injuries. She had two Christmas ornaments in her backpack.

¶ 31 h. Amy Kennedy

¶ 32 Detective Amy Kennedy interviewed J.F. (By coincidence, Kennedy had seen defendant and J.F., with J.F. wearing her leather jacket and pink backpack, walk into the Faust apartments earlier that day. However, at that time, Kennedy did not know that J.F. was a missing child.) As Kennedy began the interview, J.F.'s breathing became labored. Alex told Kennedy not to worry about J.F.'s breathing. J.F. had been diagnosed as being on the autism spectrum, and her way of breathing was a symptom, like a tic. Kennedy did not feel that she had to alter her interview style due to J.F.'s autism. J.F. answered questions in a capable manner. Like most children Kennedy had interviewed, J.F. did not always provide information in chronological order. However, J.F.

remained consistent when Kennedy circled back to specific occurrences. J.F.'s story did not change. Once the interview got fully underway, Alex left the room and Kennedy was alone with J.F.

¶ 33   J.F. told Kennedy that she left her apartment that morning and went to the bus stop. The bus took "a very long time" to arrive. Defendant approached J.F. and asked her if she wanted to go to the park. He told her that it was 6:25 a.m. They went to the park, and defendant pushed J.F. on a tire swing. They went to a gas station, where defendant bought her candy. They went to what J.F. thought to be defendant's apartment. Defendant slept on the floor, while Choppi sat with J.F. on the couch. They watched cartoons. Hein was present too, and J.F. told Kennedy that she believed that Hein was defendant's mother. Defendant and J.F. left the apartment to go back to the park, but then, according to J.F., Alex called and defendant told him that he was bringing J.F. home.

¶ 34   During cross-examination, Kennedy testified that she asked J.F. in a number of ways if defendant told her that she could not tell her father the truth about what happened that day and what she did that day with defendant. Each time, J.F. said "no."

¶ 35                         i. Officers Grover (Continued) and Leroy Armendariz

¶ 36   Grover and Officer Leroy Armendariz testified to defendant's state upon returning to Alex and J.F.'s apartment. Grover stated that, when defendant noticed the police presence at the apartment, he appeared surprised and slowed his gait. When defendant approached the police officers, he was breathing rapidly and sweating. Armendariz stated that defendant was "sweating quite a bit." He appeared nervous. Defendant initially told the officers a story that he would later admit was a lie: He left Alex's apartment that morning and went directly to his own home. When he received a text from Alex that J.F. was missing, he asked a friend to drive him back to Alex's

neighborhood to look for J.F. He found J.F. near a park and brought her back home. Defendant agreed to go to the police station for further questioning.

¶ 37                                 2. Defendant's Motion for a Directed Verdict

¶ 38    At the close of the State's case, defendant moved for a directed verdict of not guilty. He argued that the State failed to prove that defendant "knowingly and secretly confined" J.F.:

> "The State has not been able to prove that [defendant] knowingly and secretly confined [J.F.] against the will of her parent. [Defendant] has a history with [Alex] and he did not tell [J.F.] what to say, he did not tell her to lie to her father when they got to her house. His mistake came in not telling her father on the phone when he called. That lie came from a place, presumably of fear and not of criminal intent[.] [A]s the evidence has shown, as soon as he got off the phone, he walked [J.F.] home. He didn't drop her off several blocks down to have [J.F.] walk the rest of the way by herself. He walked her to the house. He knew that he was going to have to talk to his friend about what happened, but he never got that opportunity.
>
> [Defendant] did not knowingly and secretly confine J.F. and he didn't knowingly do so without the consent of the father."

¶ 39    The trial court denied the motion, explaining that, in the light most favorable to the State, the evidence showed that

> "[defendant] knew that he did not have permission to take [J.F.] to [Choppi's] apartment. The apartment itself, through the testimony, [is] a confined space. It is outside the view of the general public. It was in a locked and secured building accessible only by key fob or by keypad with a resident permitting entry into the building ***. [Also], [J.F.]

was a child under the age of 13 and that at this point in time [Alex's] testimony remains unrebutted as to the issue of consent."

¶ 40                                    3. Defendant's Case

¶ 41    Defendant testified that, on the morning in question, J.F. left the apartment at "6-something." Defendant left at 6:17 or 6:18 a.m. He noticed J.F. at the bus stop, and *she* approached *him*. She asked him for the time, and he said that it was 6:30 a.m. He thought that she missed her bus. *She* asked to go to a nearby park. Defendant took her to the park, and he kept looking back at the apartment to see if "anyone" (presumably, the woman from the night before) had left it. He had no way to get J.F. to school, so, after a stop at the gas station to buy candy, he took her to Choppi's apartment. He thought that Choppi could watch J.F. while he slept. He was still "buzzed" from the night before. After a few hours, Choppi woke him to let him know that Alex had tried to call him.

¶ 42    Defendant returned Alex's call within minutes of waking. Alex asked defendant if he had seen J.F., and defendant answered "no." Defendant did not tell Alex the truth because: "Well, I wanted to talk to Alex and make sure that nobody there was at the house, that person was gone and plus him not getting angry at [J.F.] for missing her bus."

¶ 43    After speaking with Alex, he immediately walked J.F. to her apartment. It took about 30 minutes to walk her home. When he saw the police, he lied because he felt intimidated and he "freaked out."

¶ 44    During cross-examination, defendant conceded that he told Detective Alan Semenchuk a different story. He told Semenchuk that, upon seeing J.F. near the bus stop, he told her to go home. He then told Semenchuk that it was his idea to walk away with J.F. from the bus stop. (Again, he had just testified that *J.F.* asked *him* to go to the park.) He also told Semenchuk that, in walking

J.F. away from the bus stop, he "thought [he] was doing the best for her, just getting her off the street and letting the lady deal with her until her dad got up."

¶ 45                                 4. The State's Rebuttal

¶ 46    The State called Semenchuk in rebuttal. Semenchuk, along with another officer, conducted a four-hour interview of defendant. The interview took place at the police station and it was video recorded. The State played excerpts of the video for the jury. It used the video to corroborate Semenchuk's testimony that defendant provided several different versions of the day's events, changing his story each time he was caught in a lie. In an early version, defendant told police that he saw J.F. at the bus stop, he waved to her, and he went to his own house. In that version, Choppi lived out of town with a family member in South Beloit. When Alex told him that J.F. was missing, defendant asked a friend to drive him to Alex's neighborhood. Once there, he went to a park where J.F. had "done it before," and he found her. In a later version, defendant admitted that Choppi lived at the Faust apartments. (Again, Kennedy, coincidentally, had seen defendant go there.) When confronted with security footage, defendant also admitted to taking J.F. to the gas station.

¶ 47    During cross-examination, Semenchuk agreed that defendant told him that he wanted to take J.F. "off the street" until her father woke up. Defendant had explained that he made poor choices that day because he was "stupid, tired, and buzzed."

¶ 48    Defendant again moved for a directed verdict, which the court denied. The jury found defendant guilty of aggravated kidnapping.

¶ 49                                 B. Sentencing

¶ 50    The trial court sentenced defendant to 7 years' imprisonment, 1 year over the minimum in the 6-to-60-years' sentencing range. (Due to defendant's criminal history, he had been eligible for an extended term of up to 60 years.) The court noted that defendant had a lengthy criminal history,

including burglary and driving under the influence. He had committed one violent offense, in 1992.

¶ 51    The court noted the strange character of the case:

"From the time I first saw the motion from the [child advocacy] center up through and including this point in time, I've been candidly waiting to hear the rest of the story.

On the State's behalf, I've been waiting to hear all of the terrible things [defendant] did or didn't do either to this child or to other people that you couldn't prove but would like to put on at a sentencing hearing. And what I've gotten is a criminal history and [victim-impact testimony from Alex].

From the defense side, I've been waiting to hear some kind of reasonable justification or excuse at the trial, *** if [defendant] elected to [testify] and what I heard [was] lie upon lie ***. I can't *** trust anything [defendant] has to say about this case other than *** he has demonstrated exceptionally poor decision making[.]"

¶ 52    The court observed that no harm came to J.F., stating: "[I]t's clear the child had the type of relationship [with defendant] that led her to think it was perfectly okay [although] she can't give that consent, but she didn't think she was leaving with a stranger." And, "While [Alex] certainly would have suffered the panic *** of any parent under the circumstances, [J.F.], from her experience and perspective, had a morning off of school *** in someone else's apartment watching *** television before another walk back to the park and back to her home."

¶ 53    The court wanted to deter others in a *general* sense, explaining that a person cannot think that he can walk off with another person's child. However, the court was "absolutely convinced" that, despite his criminal history, defendant was unlikely to commit another crime involving a child. Defendant had no history of preying upon children and, again, there were no signs that he

physically, mentally, or sexually abused J.F. The court did not believe that defendant took advantage of J.F.'s condition of being on the autism spectrum.

¶ 54 The court agreed with defendant that, had defendant only told Alex the truth on the phone that day, this case might not have evolved as it did. "I've concluded [that defendant's] first instinct is to be dishonest and lie, but that at least on [*sic*] the time that he was doing what he is doing, ***
I honestly think *** [defendant did not] completely understand what he was doing was a crime at the time." Further:

> "I think defendant made a series of monumentally stupid decisions that fit squarely within the aggravated kidnapping statute ***. All the dots line up. The child is too young to give consent. He did not have the permission of the father and, more to the point, *** when the father gave him an opportunity to [get] his permission, *** [h]e specifically lied to a panicked father ***."

The court sentenced defendant as stated. This appeal followed.

¶ 55                                    II. ANALYSIS

¶ 56 On appeal, defendant challenges the sufficiency of the evidence. It is the State's burden to prove every element of the offense beyond a reasonable doubt. *People v. Siguenza-Brito*, 235 Ill. 2d 213, 224 (2009). When reviewing the sufficiency of the evidence, we must ask if, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Belknap*, 2014 IL 117094, ¶ 67. All reasonable inferences from the evidence must be allowed in favor of the State. *People v. Gonzalez*, 239 Ill. 2d 471, 478 (2011). We will not substitute our judgment for that of the trier of fact in assessing witness credibility or assigning weight to the evidence. *Siguenza-Brito*, 235 Ill. 2d at 224-25.

¶ 57    Here, the State pursued an aggravated-kidnapping charge, based on a secret confinement theory.  The Code defines the offense of kidnapping as follows:

"(a) A person commits the offense of kidnapping when he or she knowingly:

(1) and secretly confines another against his or her will;

* * *

(b) Confinement of a child under the age of 13 years, or of a person with a severe or profound intellectual disability, is against that child's or person's will within the meaning of this Section if that confinement is without the consent of that child's or person's parent or legal guardian."  720 ILCS 5/10-1 (West 2016).

Further, the kidnapping is aggravated if the defendant commits kidnapping and "takes as his or her victim a child under the age of 13 years."  *Id.* § 10-2(a)(2).

¶ 58    In interpreting the kidnapping statute, the Illinois Supreme Court has defined "secret" as "concealed, hidden, or not made public."  *Siguenza-Brito*, 235 Ill. 2d at 227.  In particular, a circumstance is "secret" when it is kept from the knowledge or notice of persons liable to be affected by it.  *People v. Mulcahey*, 72 Ill. 2d 282, 285 (1978).  The supreme court has defined "confinement" as the "act of imprisoning or restraining someone."  *Gonzalez*, 239 Ill. 2d at 479. "Confinement includes, but is not limited to, enclosure within something, most commonly a structure or an automobile."  *Siguenza-Brito*, 235 Ill. 2d at 227.  The combined term "secret confinement" can be shown by proof of the secrecy of the confinement or the secrecy of the place of the confinement.  *Id.*  Also, "secret confinement can be shown through evidence that the defendant isolated the victim from meaningful contact with the public."  *Gonzalez*, 239 Ill. 2d at 480.

¶ 59    In *Gonzalez*, the court discussed the term "secretly confine." There, the defendant told her family that she was pregnant, but she was not. When she would have been due to deliver a baby, she went to the hospital. She offered to hold the fussy three-week-old infant of a patient who was busy filling out forms. She then walked away with the infant, changed its clothes, and passed it off as her own before she was apprehended several blocks away. She was found guilty, but mentally ill, of aggravated kidnapping, based on the secret confinement of a child under age 13. *Id.* at 473-77.

¶ 60    The appellate court reversed, determining that the baby was not secretly confined, because the baby was in constant public view. *Id.* at 478. The dissent disagreed, believing that the baby was secretly confined, because the individuals impacted by the defendant's actions, *i.e.*, the baby's parents, were not aware of the baby's location. *Id.* Moreover, the dissent stated, even though the baby was visible to the public, the public was unaware that the baby did not belong to the defendant. *Id.*

¶ 61    The supreme court reversed the appellate court, reinstating the conviction. *Id.* at 483. The supreme court explained that secret confinement can be shown with evidence that the defendant isolated the victim from meaningful contact with the public. *Id.* at 480. In the case before it, the baby was isolated from meaningful contact with the public, because she was unable to escape, cry out, or call attention to her plight. *Id.* at 480-81. Also, any member of the public who saw the baby would not know that the baby did not belong to the defendant, who sought to pass the baby off as her own. *Id.* at 481.

¶ 62    The court rejected the defendant's argument that the confinement must occur within a physical structure, such as a house or a vehicle. *Id.* It explained: "[T]here is no requirement, statutory or otherwise, that the victim must be held inside a physical structure. A determination

of whether the victim has been confined necessarily depends on the circumstances of each case." (Emphasis omitted.) *Id.*

¶ 63    Here, a rational trier of fact could have found that defendant committed the offense of aggravated kidnapping. It is not disputed that defendant did not have Alex's permission to be with J.F. that day and that J.F. was under age 13. Therefore, *if* defendant "knowingly and secretly confined" J.F., *then* the confinement would have been "against [J.F.'s] will." The question in this case is whether defendant "secretly confined" J.F.

¶ 64    Under *Gonzalez*, the State can prove secret confinement through evidence that the defendant's conduct isolated the victim from meaningful contact with the public. *Id.* at 482. Also, under *Mulcahey*, it is important to consider whether the alleged confinement was kept secret from the person most likely to be affected by it. *Mulcahey*, 72 Ill. 2d at 285.

¶ 65    As in *Gonzalez*, even though J.F. was visible to members of the public as she walked away from the bus stop, to the park, to the gas station, and into the Faust apartments, no one who saw her knew that defendant did not have permission to take J.F. for the day. Officer Kennedy coincidentally saw J.F. go into the Faust, but she did not know at that time that J.F. was a missing child. Also, defendant told Bennett that J.F. was his goddaughter, when defendant did not have to tell Bennett anything at all. Setting aside the issue of whether the term "goddaughter," as opposed to "close family friend," accurately described his relationship to J.F., defendant's decision to preemptively explain the relationship could be seen as an attempt to insulate himself from suspicion. Finally, defendant failed to inform Choppi and Hein that he did not have permission to care for J.F. that day. When Choppi told defendant that defendant missed Alex's call, defendant returned the call in the bathroom, and Choppi could not hear that Alex was looking for J.F. Defendant's lack of candor prevented Bennett, Choppi, and Hein from interacting with J.F. in a

meaningful way and from interceding on her behalf by, particularly in Choppi's case, informing Alex of J.F.'s whereabouts.

¶ 66 Critically, defendant kept J.F.'s location secret from the person most likely to be affected by that circumstance, Alex. For no justifiable reason, when Alex, a worried father, called defendant to ask if he had seen J.F., defendant lied. Defendant told Alex that he had not seen J.F., even though he had just spent the last six hours with her and even though she sat in the same apartment with him. At that point, J.F., a 10-year-old child, believed herself to be "a few hours" from home, was sequestered in an apartment that was not accessible to the general public, did not know the people who were in the apartment (believing Hein to be defendant's mother), and did not have a cell phone. We believe that, in the day's sequence of events, this moment—with defendant lying to Alex about J.F.'s location, with the other adults in the apartment unaware that Alex was looking for J.F., and with J.F.'s ability to return home limited by her dependence and lack of knowledge—is the moment that most supports the jury's finding that defendant knowingly and secretly confined J.F.

¶ 67 Defendant's earlier explanation for his actions—that he intended only to take J.F., a close family friend, "off the street" after she missed her bus and allow the "lady" to watch her until he slept off his buzz and Alex terminated his visit with the woman from the night before—challenged the "knowing" requirement of the kidnapping statute. "A person commits the offense of kidnapping when he or she *knowingly*: \*\*\* and secretly confines another against his or her will[.]" (Emphasis added.) 720 ILCS 5/10-1(a)(1) (West 2016). Defendant believed that he was doing a "kindness" for J.F., and, in his view, he did not *knowingly* and secretly confine her. This theory withers, however, once one considers defendant's lie to Alex. After the lie, defendant is hard-pressed to argue that he thought Alex would have approved of his actions toward J.F. Defendant

had the opportunity to present evidence that he did not knowingly confine J.F., through testimony of his close relationship with Alex and J.F. and through testimony of the previous night's events. Based on this testimony, defendant urged the jury to infer that he acted as he thought, albeit mistakenly, Alex might have wanted him to act. Defendant also had the opportunity to explain to the jury his lie to Alex and to explain that he chose to walk J.F. home immediately after the call. The jury did not accept his explanation. Now, on appeal, defendant's lie to Alex makes it impossible for him to argue that *no* evidence supported that he knowingly kept J.F. from Alex. Again, defendant's lie to Alex is the linchpin to the State's case.

¶ 68    Of course, other evidence damaged defendant's case, as well. The jury could have reasonably believed Williams's testimony regarding the timing of the bus stop. This made it more likely that defendant lured J.F. away from the bus before it arrived. Defendant knew that J.F. was supposed to be in school, and he isolated her from the public by asking her to "pretend" that she went to school.

¶ 69    The jury also could have reasonably considered defendant's after-the-fact behavior as an indication of guilt. When defendant chose to walk J.F. home, he committed to keeping her location secret from a worried father for the next 30 minutes. When defendant met Officer Lange on the walk home, he lied and told Lange that he had just then found J.F. When defendant did not take the most direct route to the apartment, the jury could have inferred that he was taking the time to make up a lie. Defendant had earlier told J.F. to keep quiet and let him do the explaining. Defendant was sweaty and nervous, and J.F. was disheveled. When defendant told the officers "lie after lie," the jury could have inferred that defendant knew that he should not have taken J.F. for the day. The evidence was sufficient to convict.

¶ 70    Defendant's arguments do not persuade us otherwise. Defendant argues that the State did not prove the "confinement" element, because he "never restrained or threatened J.F. and never restricted her movement in any way" and he "never did anything to imprison or restrain her." Unlike the victim in *Gonzalez*, J.F. was not an infant, and she could have asked for help. Defendant notes that nothing in the evidence suggests that he would not have taken J.F. home, if J.F. had asked to go home. Defendant reminds this court that "confinement" does not depend upon enclosure within something, such as a structure or a vehicle. Just as a victim can be confined without being enclosed in a structure, as in *Gonzalez*, a victim might not be confined even though she is enclosed in a structure. Thus, defendant notes, that defendant took J.F. to an apartment does not automatically mean that he confined her. Defendant further argues that, if J.F.'s mere presence in an apartment building was enough to satisfy the confinement element, then there would be "no difference" between the Class X felony of aggravated kidnapping and the Class A misdemeanor of harboring a runaway. A person commits the offense of harboring a runaway when he, "without the knowledge and consent of the minor's parent or guardian, knowingly gives shelter to a minor *** for more than 48 hours without the consent of the minor's parent or guardian, and without notifying the local law enforcement authorities." *Id.* § 10-6(a). (At oral argument, defendant also compared his offense to the Class 4 felony offenses of luring a minor (*id.* § 10-5.1(a)) and unlawful restraint (*id.* § 10-3(a)).)

¶ 71    As we have already discussed, however, the evidence was sufficient for a jury to find that defendant confined J.F.: defendant took J.F. away from a bus stop, to an unfamiliar apartment, with unfamiliar people, without a cell phone, keeping her whereabouts unknown to her father, and isolating her from meaningful interaction with the public. J.F. was restrained, based on circumstances beyond enclosure within a building. Also, this case is not similar to harboring a

runaway. J.F. did not seek shelter from defendant. Defendant took J.F., a 10-year-old girl, away from the bus stop, and *he* brought *her* to an unfamiliar apartment. He did not simply fail to inform her father or authorities of her location; he brought her to the location in question and then he returned her father's call only to lie about her location.

¶ 72 Defendant also complains that much of the State's brief is "dedicated to arguing that the confinement was 'secret,' when the actual issue on appeal is whether there was any confinement in the first place." True, the terms "secret" and "confinement" each have individual definitions, those being "concealed, hidden, or not made public" and "the act of imprisoning or restraining someone," respectively. However, the two elements are linked. Plainly, the term "secretly" in the statute is an adverb modifying "confines": "[a] person commits the offense of kidnapping when he or she knowingly: *** and secretly confines another against his or her will." *Id.* § 10-1(a)(1). Also, under *Gonzalez*, the combined term secret confinement can be shown through evidence that "the defendant isolated the victim from meaningful contact with the public." *Gonzalez*, 239 Ill. 2d at 480.

¶ 73 Contrary to defendant's position, the modifiers "knowingly" and "secretly" make it more difficult for the State to prove confinement, not less. Through his theory of the case, defendant essentially has asked the question, "When does caring for a child under age 13 without the parent's permission become kidnapping?" Looking at the term "confinement" solely in terms of "restraint," as defendant urges, is insufficient to answer that question, because every caregiver to a young child restrains that child's movement, often under implicit threat of punishment: "Stay near me"; "Stay in the house"; and "Do not go in the street." That the acts supporting a conviction of kidnapping a child must be of a different character and carry a certain *gravitas* is consistent with the crime's label as a Class X felony and its minimum penalty of six years' imprisonment. The

modifiers "knowingly" and "secretly" help to ensure that a kidnapping conviction is based on acts that fit the spirit of the kidnapping statute, not just the isolated element of confinement.

¶ 74   Again, although we reject defendant's arguments, their overarching theme is not lost on us. Defendant, through his collective arguments, suggests that, even if his acts technically satisfied the kidnapping statute, his acts were not in the character of a Class X felony. Indeed, unlike the other cases discussed by the parties, defendant did not harm the victim (the trial court, at least, was "absolutely convinced" of this), profit from the kidnapping, or take the child as his own. *Cf.*, *Gonzalez*, 239 Ill. 2d 471 (kidnapper tried to pass off an infant as her own child); *Siguenza-Brito*, 235 Ill. 2d 213 (kidnapper forced the victim into a car before trapping her in a garage and sexually assaulting her); *People v. Phelps*, 211 Ill. 2d 1 (2004) (kidnapper brandished a gun and made the victim undress, making it more difficult for the victim to flee the apartment); *People v. Enoch*, 122 Ill. 2d 176 (1988) (kidnapper tied up the victim in her apartment); *Mulcahey*, 72 Ill. 2d 282 (kidnapper taped the victim to a chair and demanded ransom); *People v. Reeves*, 385 Ill. App. 3d 716 (2008) (kidnapper confined the victim in a garage and later sexually assaulted and murdered her); *People v. Jackson*, 281 Ill. App. 3d 759 (1996) (kidnapper transported the victim to a bridge against her will, where she was later murdered).

¶ 75   The trial court, through its commentary at sentencing, gave credence to defendant's position that this crime was of a different character than other aggravated kidnapping cases. The court stated, *inter alia*, that it was "waiting to hear the rest of the story." It was waiting to hear what "terrible," yet inadmissible acts, defendant did, and all it heard was defendant's criminal history. It was also waiting to hear some sort of justification from defendant for why he acted the way he did, and all it heard was "lie after lie." Still, the court was "absolutely convinced" that defendant was not a child predator and did not harm J.F. Rather, the court observed, defendant

made a series of "monumentally stupid decisions" that fit squarely within the confines of the kidnapping statute. This is particularly true where defendant lied to Alex about J.F.'s whereabouts, removing any question as to the knowing element.

¶ 76    In sum, we have been charged with deciding whether the evidence was sufficient to convict defendant. It was. We cannot override the jury's decision.

¶ 77                                    III. CONCLUSION

¶ 78    For the reasons stated, we affirm defendant's aggravated kidnapping conviction.

¶ 79    Affirmed.

---

**No. 2-18-0217**

---

| | |
|---|---|
| **Cite as:** | *People v. Gaines*, 2020 IL App (2d) 180217 |

---

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Winnebago County, No. 17-CF-1209; the Hon. Brendan A. Maher, Judge, presiding. |

---

| | |
|---|---|
| **Attorneys for Appellant:** | James E. Chadd, Thomas A. Lilien, and Christopher McCoy, of State Appellate Defender's Office, of Elgin, for appellant. |

---

| | |
|---|---|
| **Attorneys for Appellee:** | Marilyn Hite Ross, State's Attorney, of Rockford (Patrick Delfino, Edward R. Psenicka, and David S. Friedland, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |

---