2021 IL App (2d) 190001-U
No. 2-19-0001
Order filed June 14, 2021

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Du Page County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 17-DT-2648 |
| DWAN D. THOMPSON, | ) ) ) | Honorable Anthony V. Coco, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE ZENOFF delivered the judgment of the court.
Justices McLaren and Hutchinson concurred in the judgment.

**ORDER**

¶ 1    *Held*:   The expert testimony at defendant's trial supported a finding that defendant's blood contained a prohibited concentration of delta-9-tetrahydrocannabinol within 2 hours of his driving or being in actual physical control of a vehicle, in violation of the Illinois Vehicle Code.

¶ 2    Following a bench trial in the circuit court of Du Page County, defendant, Dwan D. Thompson, was found guilty of speeding and violating section 11-501(a)(7) of the Illinois Vehicle Code (625 ILCS 5/11-501(a)(7) (West 2016)). Section 11-501(a)(7) provides:

"(a) A person shall not drive or be in actual physical control of any vehicle within this State while:

* * *

>(7) the person has, within 2 hours of driving or being in actual physical control of a vehicle, a tetrahydrocannabinol concentration in the person's whole blood or other bodily substance as defined in paragraph 6 of subsection (a) of Section 11-501.2 of this Code." *Id.*

Section 11-501.2(a)(6) of the Illinois Vehicle Code (625 ILCS 5/11-501.2(a)(6) (West 2016)) defines "Tetrahydrocannabinol concentration" as "either 5 nanograms or more of delta-9-tetrahydrocannabinol per milliliter of whole blood or 10 nanograms or more of delta-9-tetrahydrocannabinol per milliliter of other bodily substance." On appeal, defendant does not challenge his speeding conviction. However, he argues that the substance found in his urine was not delta-9-tetrahydrocannibinol and that his conviction of violating section 11-501(a)(7) cannot stand. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4      At trial, Lombard police officer Evan Boros testified that he observed defendant driving above the speed limit. Boros's radar indicated that defendant's vehicle was traveling at 52 miles per hour in a 35-mile-per-hour zone. Boros pulled defendant over. Defendant had bloodshot, watery eyes. Boros detected the odor of an alcoholic beverage on defendant's breath. In addition, Boros smelled the odor of burnt cannabis coming from the driver's side window. Boros saw a hand-rolled cigarette or cigar in a cup holder. Boros asked defendant if he had been drinking or smoking weed. Defendant said that he had been. Boros administered field sobriety tests to defendant. Defendant's performance on some of the tests indicated to Boros that defendant was impaired. Boros placed defendant under arrest. Defendant submitted to a Breathalyzer test, which showed that his alcohol level was below the legal limit.

¶ 5      Defendant also provided a urine sample.  Jennifer Bash, a forensic toxicologist employed by the Analytical Forensic Testing Laboratory at the University of Illinois at Chicago, tested the urine sample and testified as an expert for the State.  Bash used "a screening and a quantitative technique" to test the sample.  She tested it for delta-9-tetrahydrocannabinol, which is commonly referred to as THC.  THC is metabolized in the liver, where a molecule called glucuronide attaches to it.  The resulting compound, which is known as a "conjugated compound," can then be excreted from the body in the urine.  When urine is tested for the presence of THC, part of the sample goes through a hydrolysis process that removes the glucuronide.  With the glucuronide removed, the THC can be pulled out of the urine into an organic solvent.  Another part of the urine sample does not go through hydrolysis process.  Testing on that portion of the sample reveals the presence, if any, of "free THC," which is THC that never had glucuronide attached.

¶ 6      The trial court asked Bash whether conjugated THC and free THC were "two separate things."  Bash responded:

> "In a way.  The way to think of the complexation is that it's as though two people decided to hold hands.  The complexation doesn't actually change the person.  By holding hands with somebody you don't suddenly become a different person.  You don't have different hair color or eye color or anything like that.  That's what the complexation basically is. It's kind of a hand holding.  When you remove that, you just take that off to allow it to change its physical properties."

¶ 7      Bash testified that the "complexation" does not change the entire molecule.  According to Bash:

> "To actually change one molecule into another you need to actually form some sort of carbon bond or remove a carbon bond.  With a complexation it's different because you are

not actually forming any sort of new carbon bonds or removing carbon bonds. In this instance it simply removes and substitutes in an acidic proton."

According to Bash, free and conjugated THC both contain delta-9-tetrahydrocannabinol and adding or removing glucuronide does not change the chemical properties of delta-9-tetrahydrocannabinol.

¶ 8 Bash testified that her testing "detected THC at a concentration of 27.3 plus or minus 3.3 nanograms per [milliliter]." That amount did not include any free THC. Bash testified that, to her knowledge, there was no way that the THC could have been produced in defendant's urine by any source other than consumption of cannabis.

¶ 9 John Wetstein, testified as an expert for the defense. He was the toxicology training coordinator for the Illinois State Police Division of Forensic Sciences. Wetstein reviewed the laboratory report for the testing on defendant's urine sample. The report "indicated the presence of conjugated THC at a level of 27 nanograms per [milliliter] and no free THC." Wetstein testified that one would expect to find conjugated THC only in the urine. Because the urine has no direct contact with the central nervous system, conjugated THC does not have a pharmacological effect. Wetstein testified that conjugated THC does not get people high or affect their motor skills. Asked whether conjugated THC was "a separate and distinct compound from [delta-9-tetrahydrocannabinol]," Wetstein testified, "It is THC with something added to it, it is making it a different compound." Conjugated THC has a larger mass than delta-9-tetrahydrocannabinol.

¶ 10 Wetstein testified that when THC is ingested, it undergoes two primary types of metabolism. In phase one metabolism, THC is converted to hydroxy-THC and then to carboxy-THC. Those compounds become conjugated when they reach the liver and kidneys. The body attaches a glucuronide molecule to the THC, making it "more polar and more water soluble."

Hydroxy-THC is "active," meaning that it "binds to the cannabinoid receptors and elicits the same response as THC." Hydroxy-THC gets people high. Carboxy-THC is inactive; it does not get people high.

¶ 11    Wetstein was asked whether delta-9-tetrahydrocannabinol was present in defendant's urine when it was sent to the laboratory. Wetstein responded, "When you say delta-9 to me I am interpreting that to mean free THC and no, not present." Wetstein testified that removal of the glucuronide during the testing process did not cause a new chemical structure to form. Rather, "[i]t reveals what was there to begin with." Wetstein explained, "You are not making anything new. You are reverting it to its perhaps former self." However, the "binding process" creates a different compound. Wetstein acknowledged that the 27.3 nanograms per milliliter were of delta-9-tetrahydrocannabinol "after they have just been broken apart from [the] glucuronide."

¶ 12    The trial court found defendant guilty of violating section 11-501(a)(7). The court relied primarily on Bash's testimony, but the court also noted that "one of the key pieces of evidence *** that help[ed] the State" was Wetstein's testimony that the 27.3 nanograms per milliliter were of delta-9-tetrahydrocannabinol after it was separated from the glucuronide.

¶ 13    Defendant filed a posttrial motion, which the trial court denied. Defendant then filed this timely appeal.

¶ 14                                    II. ANALYSIS

¶ 15    Defendant argues that the State failed to prove beyond a reasonable doubt that his urine contained delta-9-tetrahydrocannibinol. He maintains that conjugated THC is not the same thing as delta-9-tetrahydrocannibinol and that his conviction cannot be sustained based on its presence in his urine. Defendant notes that, before section 11-501(a)(7) was enacted, section 11-501(a)(6) made it an offense to drive with:

"any amount of a drug, substance, or compound in the person's breath, blood, or urine

*resulting from the unlawful use or consumption of cannabis listed in the Cannabis Control*

*Act*, a controlled substance listed in the Illinois Controlled Substances Act, an intoxicating

compound listed in the Use of Intoxicating Compounds Act, or methamphetamine as listed

in the Methamphetamine Control and Community Protection Act." (Emphasis added.) 625

ILCS 5/11-501(a)(6) (West 2014).

Under that provision, it was not necessary to prove the presence of a specific form of THC or any

minimum amount of THC. When the General Assembly enacted section 11-501(a)(7), it also

deleted the references in section 11-501(a)(6) to cannabis and the Cannabis Control Act. See Pub.

Act 99-697, § 20 (eff. July 29, 2016). Thus, a conviction can no longer be sustained based on the

presence of any amount of any substance resulting from the unlawful use or consumption of

cannabis. By the same enactment, the General Assembly added section 11-501.2(b-5)(1) (625

ILCS 5/11-501.2(b-5)(1) (West 2016)), which provides, "If there was a tetrahydrocannabinol

concentration of 5 nanograms or more in whole blood or 10 nanograms or more in an other [*sic*]

bodily substance as defined in this Section, it shall be presumed that the person was under the

influence of cannabis." See Pub. Act 99-697, § 20 (eff. July 29, 2016).

¶ 16    A reviewing court will not set aside a criminal conviction unless the evidence is so

improbable or unsatisfactory that it creates a reasonable doubt of the defendant's guilt. *People v.*

*Collins*, 106 Ill. 2d 237, 261 (1985). On a challenge to the sufficiency of the evidence, " 'the

relevant question is whether, after viewing the evidence in the light most favorable to the

prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond

a reasonable doubt.' " (Emphasis in original.) *Id.* (quoting *Jackson v. Virginia*, 443 U.S. 307,

319 (1979)). "We will not substitute our judgment for that of the trier of fact in assessing witness

credibility or assigning weight to the evidence." *People v. Gaines*, 2020 IL App (2d) 180217, ¶ 56.

¶ 17    Defendant asserts that the meaning of "delta-9-tetrahydrocannabinol" is a question of statutory interpretation, subject to *de novo* review.[1] We disagree.  The dispositive issue is whether the substance found in defendant's urine was delta-9-tetrahydrocannabinol.  That is a question of fact to be decided based on the scientific evidence presented.  We conclude that the evidence was sufficient to sustain defendant's conviction.  The evidence shows that the conjugated compound in defendant's urine was delta-9-tetrahydrocannabinol with glucuronide attached.  Bash testified that there were no carbon bonds between the delta-9-tetrahydrocannabinol and the glucuronide, so the attachment of the glucuronide did not form a new molecule.  The trial court was not obliged to find that attachment of the glucuronide negated the presence of delta-9-tetrahydrocannabinol in defendant's urine.

¶ 18    It is true that Wetstein interpreted "delta-9-tetrahydrocannabinol" to mean free delta-9-tetrahydrocannabinol, and he testified that conjugated THC is "a different compound."  However, he also testified that the testing process, which simply detached the glucuronide from the

---

[1] Consonant with his view that this case presents a question of statutory interpretation, defendant has cited extensive excerpts from the debates in the Senate on the relevant amendments.  The excerpts tend to show that the legislature intended to create an objective standard for determining impairment based on the use of cannabis.  We do not find the debates particularly illuminating, however, on the question before us in this case: whether conjugated delta-9-tetrahydrocannabinol, or only free delta-9-tetrahydrocannabinol, satisfies the standard.

conjugated compound, "reveal[ed] what was there to begin with," *i.e.* delta-9-tetrahydrocannabinol.

¶ 19    Defendant stresses that Wetstein testified that the conjugated compound does not have any pharmacological effects. However, he explained that the reason that is the case is that urine has no contact with the central nervous system. The statute does not require that delta-9-tetrahydrocannabinol be found in a body substance that is in contact with the central nervous system.

¶ 20    Based on the evidence, the trial court could rationally conclude that defendant's urine contained delta-9-tetrahydrocannabinol that was itself part of the conjugated compound. The attachment of glucuronide to delta-9-tetrahydrocannabinol did not create a different molecule, but rather merely functioned to allow the delta-9-tetrahydrocannabinol to be carried into defendant's urine. The evidence was sufficient to sustain defendant's conviction.

¶ 21                                III. CONCLUSION

¶ 22    For the foregoing reasons, the judgment of the circuit court of Du Page County is affirmed.

¶ 23    Affirmed.